# SEALED

FILED

APR 1 2 2011

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

SEALED §
§
§ **SA11CA0294 FB**
§
VS. § CAUSE NO. SA-11-CA-_____
§
§ **FILED IN CAMERA**
§ **AND UNDER SEAL**
SEALED § **JURY TRIAL DEMANDED**

## COMPLAINT FOR DAMAGES AND OTHER RELIEF
## UNDER THE FALSE CLAIMS ACT AND THE
## TEXAS MEDICAID FRAUD PREVENTION ACT

Marlene M. Martin
Texas Bar No 13093770
One Elm Place
11107 Wurzbach Road, Suite 305
San Antonio, Tx 78230
(210) 641-5100 telephone
(210) 641-5101 facsimile

1



SEALED

**FILED**

APR 1 2 2011

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
　　　　　　DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>AND THE STATE OF TEXAS, *ex rel.,*<br>LISA FOERSTER,<br>MICHELLE WITHERS GAWLIK,<br>TAMARA MUNOZ, MANUEL RAMIREZ,<br>AND CATHERINE REYNA, Plaintiffs<br><br>VS.<br><br>MOLINA HEALTHCARE, INC,<br>AND MOLINA HEALTHCARE OF<br>TEXAS, INC., Defendants | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

**SA11CA0294FB**

CAUSE NO. SA-11-CA-____

**FILED IN CAMERA
AND UNDER SEAL**

**JURY TRIAL DEMANDED**

**COMPLAINT FOR DAMAGES AND OTHER RELIEF
UNDER THE FALSE CLAIMS ACT AND THE
TEXAS MEDICAID FRAUD PREVENTION ACT**

**INTRODUCTION AND PRELIMINARY STATEMENT**

1.　　Plaintiffs bring this *qui tam* action on behalf of The United States of

America, The State of Texas, and themselves arising under the provisions of Title 31

U.S.C. §3729, the False Claims Act (the "Act") and under the provisions of §3730 of the

Act, and for themselves and the State of Texas pursuant to the Texas Medicaid Fraud

Prevention Act. ("TMFPA"), Tex. Hum. Res. Code. Ann. §§36.001-132, and the

authority granted under TMFPA §36.101. In this action, Plaintiffs seek to recover

damages and civil penalties for violations of the Act and the TMFPA by the Defendants

and their employees and/or agents arising from false claims, and misrepresentations

presented by or caused to be presented by Defendants to the United States and its

1

agents and intermediaries and to the State of Texas under federal and state health programs, including Medicaid ("the Government Health Programs"), as well as the concealment of material information from the Government Programs.

2.      Defendant Molina Healthcare of Texas, Inc. ("MHT"), a subsidiary of Molina Healthcare, Inc., ("Molina"), was awarded the contract to be the Managed Care Organization for the Medicaid program in Bexar County (the "Contract"). Defendant, a health insurance plan, has been working under the Contract with the State of Texas in Bexar County from 2007 to the present. Defendants received capitated premiums revenue in exchange for providing certain health-related services to eligible Texas Medicaid members. Plaintiffs will show that Defendants performed unlawful, false acts, including, but not limited to, failing to provide medically necessary contracted services, denying qualified Medicaid members certain medically necessary services, and not providing the requisite quality of care to members. These unlawful acts were done in violation of MHT's MCO contract with the Medicaid program, but all the while Defendants billed for and accepted payment for services not performed or improperly performed while concealing the truth of their illegal actions. Additionally, Plaintiffs will show that Defendants deprived Medicaid members of the right to choose their suppliers and deprived them of accommodations to which Medicaid members are entitled. The United States and the State of Texas require compliance with federal and state law regulating Medicaid contracts, including statutes and regulations, as a condition of payment to vendors and contractors.

2

3. The False Claims Act ("FCA") provides, in pertinent part, that:

   (a) Any person who...(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government...a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid...

   ****

   is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000 per claim or per violation, plus 3 times the amount of damages which the Government sustains because of the act of that person...

   (b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information...(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required

4. The Texas Medicaid Fraud Prevention Act provides, in pertinent part, the following:

Tex. Hum. Res. Code. Ann. §36.002. UNLAWFUL ACTS. A person commits an unlawful act if the person:

   (a) knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

   (b) knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

3

(c)     knowingly applies for and receives a benefit or payment on behalf of another person under the Medicaid program and converts any part of the benefit or payment to a use other than for the benefit of the person on whose behalf it was received;

(d)     knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:

****************************

(e)     knowingly makes a claim under the Medicaid program for:

(1)     a service or product that has not been approved or acquiesced in by a treating physician or health care practitioner;

(2)     a service or product that is substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry; or

(3)     a product that has been adulterated, debased, mislabeled, or that is otherwise inappropriate;

(f)     makes a claim under the Medicaid program and knowingly fails to indicate the type of license and the identification number of the licensed health care provider who actually provided the service;

(g)     knowingly enters into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another person in obtaining an unauthorized payment or benefit from the Medicaid program or a fiscal agent;

(h)     is a managed care organization that contracts with the Health and Human Services Commission or other state agency to provide or arrange to provide health care benefits or services to individuals eligible under the Medicaid program and knowingly:

(1)     fails to provide to an individual a health care benefit or service that the organization is required to provide under the contract;

(2)     fails to provide to the commission or appropriate state agency information required to be provided by law, commission or agency rule, or contractual provision; or

4

(3)   engages in a fraudulent activity in connection with the enrollment of an individual eligible under the Medicaid program in the organization's managed care plan or in connection with marketing the organization's services to an individual eligible under the Medicaid program;

(i)   knowingly obstructs an investigation by the attorney general of an alleged unlawful act under this section;

(j)   knowingly makes, uses, or causes the making or use of a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to this state under the Medicaid program.

5.     As required under 31 U.S.C. §3730(e) of the Act, there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.

### Jurisdiction and Venue

6.     This Court has jurisdiction of this action pursuant to 28 U.S.C. §§1331 and 1345 and 31 U.S.C. §3730 and 3732 of the Act. The action arises out of violations of 31U.S.C. §3729 by the Defendants, and certain of the acts proscribed by 31 U.S.C. §3729 occurred in this judicial district. In addition, the Defendants can be found, reside, transact or have business in this judicial district.

7.     This Court has supplementary jurisdiction of the claims asserted on behalf of the State of Texas pursuant to 31 U.S.C.§3732(b). In accordance with 31 U.S.C. §3732(b), this action is brought, in part, under the laws of the State of Texas for the recovery of funds owed to the State of Texas and that arise from the same transaction and/or acts brought under 31 U.S.C. §3730. This action is brought by the five Plaintiffs,

(Collectively, the "Plaintiffs") on behalf of the United States of America to recover all damages, penalties and other remedies established by and pursuant to 31 U.S.C. §3729-3733, and the five Plaintiffs, in their individual capacities, claim entitlement to a portion of any recovery obtained by the United States as *qui tam* Plaintiffs as authorized by 31 U.S.C.§3730 or obtained by the State of Texas as authorized by Tex. Hum. Res. Code. Ann. §36.115.

8.      Venue is proper in this judicial district pertinent to 31 U.S.C. §3732(a) and 28 U.S.C. §§1391 and 1395.

### Filing Under Seal

9.      In accordance with 31 U.S.C. §3730(b)(2) and Tex. Hum. Res. Code Ann §36.102(b), this complaint is filed in camera and under seal and will remain under seal for 60 days and will not be served on the Defendants until the Court so orders.  A copy of the complaint and written disclosure of substantially all material evidence and information the Plaintiffs possess have been served contemporaneously on the United States pursuant to 31 U.S.C. §3730(b)(2) and on the State of Texas pursuant to Tex. Hum. Res. Code Ann §36.102(a).  This disclosure statement supports the existence of false and fraudulent claims submitted by the Defendants to the United States and the State of Texas.

### The Parties to the Action

10.      Relator, Lisa Foerster ("Foerster"), was employed by Defendant Molina Healthcare of Texas in 2007-2008 as a Clinical Care Coordinator I (CCC1) in its San

Antonio, Texas facility at all times relevant to this complaint. She is a resident of Wilson County. Foerster has a Masters in Social Work (MSW). She is a seasoned professional with a background in case management and has worked extensively with low-income, at-risk populations in the areas of healthcare and in the penal system. Because of her expertise as an MSW, Foerster was assigned by MHT as a trainer among her other duties.

11.     Relator, Michelle Withers Gawlik ("Gawlik"), was employed by Defendant Molina Healthcare of Texas in 2007-2008 as a Clinical Care Coordinator 1 (CCC1) in their San Antonio, Texas facility at all times relevant to this complaint.  She is a resident of Bexar County. Gawlik has a BS degree in Community Health and an extensive background in case management and in working with the elderly and blind.  In her capacity as CCC1, Gawlik provided services in Bexar and surrounding counties, specifically she coordinated long-term care services for the Blind, Disabled and Low Income members within the Texas Medicaid Program. Services performed include referrals for in-home provider services, assisting members with activities of daily living and adult day care/senior center programs.  She conducted in-home assessments, and evaluated the needs of Medicaid members in relation to health needs.

12.     Relator, Tamara Munoz ("Munoz"), was employed by Defendant Molina Healthcare of Texas in 2007-2008 as a Clinical Care Coordinator I in their San Antonio, Texas facility at all times relevant to this complaint. She is a resident of Bexar County. Munoz has earned a Bachelor's degree in Social Work (BSW).  Her career work has

been as an investigator with Child Protective Services, and working with the blind, and young pregnant women. Tamara's duties at MHT included performing assessments on clients receiving Star Plus Medicaid to determine eligibility for services.

13.    Relator, Manuel Ramirez ("Ramirez), was employed by Defendant Molina Healthcare of Texas  in 2007-2008 as a Clinical Care Coordinator I in their San Antonio, Texas facility at all times relevant to this complaint.  He is a resident of Bexar County. Ramirez worked at the Texas Department of Health and Human Services for many years before he retired.   While employed at MHT, it was Ramirez' job to determine eligibility for the Non-Waiver/Primary Home Program and to make referrals to agency providers as needed. Manuel has a degree in Biology, but has 6 years of post-graduate work in psychology and counseling. He is a resident of Bexar County.

14.    Relator, Catherine Reyna ("Reyna"), was employed by Defendant Molina Healthcare of Texas in 2007-2008 as a Clinical Care Coordinator I in their San Antonio, Texas facility at all times relevant to this complaint.  She is a resident of Bexar County. Reyna has a B.S. in Liberal Arts Studies. She has a strong background in the managed care field having worked for the Department of Health and Human Services and DADS for more than 28 years before retiring. When Reyna worked for the State, she supervised an intake unit with 15 social workers, and various clerical staff.  During those years she worked with a program, Community Based Alternatives, a predecessor to the STAR Plus Program. At MHT, Reyna supervised staff who determined eligibility for aged, blind and disabled clients in the Long Term Care Program. She further selected,

8

managed and developed staff, as well as managed unit operations to achieve program objectives for service delivery. Reyna has had extensive hands-on experience with the aged, the blind and disabled.

15.     The five Plaintiffs in this case worked at the same San Antonio facility during the same period, on the same teams and in similar positions as Clinical Care Coordinators or service coordinators.  A CCC1 is a college graduate with a degree in a social work field. CCC1s work with Level 1 and 2 members under Star Plus. A CCC2 is a college graduate with a nursing degree. Only CCC2s could service Level 3 members under the Star Plus Waiver Program.

Plaintiffs were five of eight CCC1s employed by MHT at all times relevant to this complaint, which covers the period from 6/2007 to 8/2008. The Plaintiffs became concerned with the unlawful acts they observed at the MHT facility and first attempted to bring their concerns before management in 2008. Various spirited discussions ensued for weeks regarding Plaintiffs' observations of Medicaid violations. In the summer of 2008, the five Plaintiffs met confidentially with Daisy Mitchell, Director of Human Resources, regarding the alleged unlawful practices at MHT.  They were later joined by Chuck Carroll, the President of MHT. Within a month of so doing, the five CCC1s were laid off.

16.     Defendant Molina Healthcare, Inc. ("Molina") has been a publicly traded company since its 2002 IPO. It provides managed care services to eligible members enrolled in Medicaid, Medicare and other government- sponsored programs through 16

9

subsidiaries. Molina has health plans in California, Indiana, Michigan, New Mexico, Ohio, Texas, Utah, Washington, Florida, Louisiana, Idaho, Maine, New Jersey, West Virginia, Virginia, Wisconsin and as well as 19 primary care clinics located in Northern and Southern California. The company's corporate headquarters are in Long Beach, California. Its health plans in 2010 covered 1.4 million members, and brought in revenues of $3.1 billion and $62 million in profit.  The top company leaders are Molina family members, and they have a significant presence as they exert a great deal of control on the Company.  A large percentage of the Company stock is owned by Molina individuals, Molina Siblings Trust, other Molina trusts, and various other Molina entities.

17.     Molina Healthcare of Texas, Inc ("MHT") is a subsidiary of Molina ("Molina").  In 2007, MHT was awarded the contract with the Texas Health and Human Services Commission to provide Medicaid managed care services in Bexar County and Harris County under the STAR and STAR PLUS programs.   Today, it also serves children in the CHIPS program and the elderly, blind and disabled.

## MEDICAID AND MANAGED CARE IN TEXAS
## REGULATORY SCHEME

18.     Medicaid was created in 1965 under Title XIX of the Social Security Act. Funding for Medicaid is shared between the Federal Government and those states participating in the program; the funding division varies from state to state but usually approximates an equal division. Under Title XIX of the Social Security Act ("Medicaid"), 42 U.S.C. §1396 *et. seq.*, federal money is distributed to the states, which in turn

provide certain medical services to the poor. Federal Medicaid regulations require each state to designate a single state agency responsible for the Medicaid program. The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX and with the regulations of the Secretary of the United States Department of Health and Human Services (the "Secretary"). After the Secretary approves the plan submitted by the State, the State is entitled each quarter to be reimbursed for a percentage of its expenditures made in providing specific types of "medical assistance" under the plan. 42 U.S.C. §1396b(a)(1). This reimbursement is called "federal financial participation" ("FFP").

19.   For fiscal year 2010, the FFP for Texas is 60.87% meaning that the federal government   reimburses the state for that percentage of the Medicaid monies spent on eligible Members. The Health and Human Services Commission (HHSC) has been the administering state agency for the Medicaid program in Texas since January 1993.  While states are responsible for the hands-on operation of Medicaid, the federal government plays a very active oversight role. The Centers for Medicare and Medicaid Services (CMS), part of the U.S. Department of Health and Human Services, oversees the Medicaid program. CMS approves the Medicaid State Plan that each state creates, as well as any waivers for which states apply. CMS approved the Texas' various Medicaid Plans as well as several waivers.  In Texas, about 65% of its total Medicaid population is served by an MCO.

11

20.    The United States and The State of Texas both have a strong interest in how every Medicaid dollar is spent.  Medicaid fraud, the submission of false claims for payment, the concealment of relevant healthcare information, the failure to provide health services or providing substandard or medically unnecessary services causes damage to both the Federal and Texas fisc.

21.    In Texas, one of the delivery methods for Medicaid services is the State of Texas Access Reform (STAR Plus) which is a capitated health insurance plan serving the aged, blind and disabled.  It is operated by a managed care organization (MCO) selected through an Request for Proposal ("RFP").  The State pays the MCO a capitation fee for each covered Medicaid life.   The MCO assumes responsibility for the health care needs of every Medicaid member on its roll, and the MCO must provide all medically necessary healthcare services and assume the risk for any loss during the period of coverage. If the cost of providing to the healthcare needs of the membership plus administrative costs are less than the capitated premiums, the MCO is profitable. If not, the MCO must absorb the loss.  These insurers are called "*pure plays*" because they only insure Medicaid and other government insurance plan members, and do not diversify their risk pool with other populations.

22.    In 2007, MHT won the bid to be one of the MCO healthcare plans in Bexar County administering the STAR Plus and STAR Plus Waiver program.  Earlier, MHT had been awarded its first MCO contract in Harris County, Texas.

23.    Molina  Healthcare  of  Texas,  Inc  (MHT),  a  subsidiary,  was  formed  to

12

conduct managed care operations in Texas to include primarily Medicaid but later Medicare and other government Plans.

24.    Successful MCOs manage to maintain a "medical loss ratio" of less than 85%, that is, the total cost of medical services from every capitated dollar it receives. With an administrative cost of 8-10%, the profit margins can be slim for most MCOs, but lucrative.  Molina and MHT were very aggressive in keeping the MCO in the black. Plaintiffs allege that the company often engaged in unlawful acts to enhance their profitability.

### MEDICAID STAR+PLUS, AND STAR+PLUS WAIVER PROGRAM

25.    Level 1 (Assessments can be done by a CCC1). The STAR Plus program enrolls members that are eligible for Medicaid services, but are in relatively good health and rarely access more than preventive care services.  The STAR Plus program provides all of the services available in traditional Medicaid, as well as an annual check-up, prescriptions, and health education classes. In 2009. the monthly capitated premium for each Medicaid life in the STAR Plus Program was $642.69. In 2010, it is $804.64.

26.    Level 2 (Assessments can be done by CCC1).  STAR+PLUS is a Texas Medicaid managed care program designed to provide health care, acute and long-term services and support through a managed care system. The blind, the elderly and the disabled represent the STAR+Plus population that Relators serviced. It is considered a cost-neutral model for the integrated delivery of acute and long-term services and

support for Medicaid recipients over age 65 and those with disabilities. STAR+PLUS provides a continuum of care with a range of options and flexibility to meet individual needs. The program worked to increase the number and types of providers available to Medicaid clients.  Participants of STAR+PLUS choose a health plan (HMO) from those available in their county, and receive Medicaid services through those health plans. Through these health plans, the STAR+PLUS program combines traditional health care (such as doctor visits) and long-term services with additional support, such as providing help in the Member's home with daily activities, home modifications, respite care (short-term supervision) and personal assistance. Service coordination is the main feature of STAR+PLUS. Medicaid clients, their family members and providers work together to help clients coordinate health, long-term and other community support services.

27.     Level 3 (Assessments can only be done by a CCC2, who must be a registered or degreed nurse). The STAR+ Plus Waiver (SPW) Program is a 1915(c) waiver program approved for the managed care delivery system, designed to allow individuals who qualify for nursing facility care to receive long-term services and supports in order to be able to live in the community.  The reimbursement rates are based on the Individual Service Plan (ISP) with a Member's specific needs determined independently , and with the final approval of HHSC.

28.     Elements of the STAR+PLUS Waiver system that are different from the STAR Plus service delivery include:

- 1915(b) Waiver — Authority granted to the state of Texas to allow

14

delivery of Medicaid State Plan acute and long-term services and supports (Primary Home Care and Day Activity and Health Services) through a managed care delivery system in specific service areas.

- 1915(c) Waiver — Authority granted to the state of Texas to allow delivery of long-term services and supports that assist consumers to live in the community in lieu of a nursing facility. This is also known as the SPW.

- Health and Human Services Commission (HHSC) — The state agency responsible for Medicaid. Some functions related to STAR+PLUS are delegated to the Department of Aging and Disability Services (DADS).

- Individual Service Plan (ISP)— A care plan that is person-directed, specific to the needs of the individual. It is done with the concurrence of the HMO and (DADS) for STAR+PLUS Waiver services.

- STAR+PLUS Support Unit (SPSU) — DADS staff who support and coordinate certain aspects of the STAR+PLUS program.

## DEFENDANTS' FRAUDULENT CONDUCT

During their tenure at MHT, Plaintiffs observed unlawful activity that they allege violates the Act and the TMFPA. Plaintiffs have prepared a Disclosure Statement with actual examples to support their allegations.

I.

### Services performed by Individuals without Required Credentials and Problems from Understaffing:

29.   The five Plaintiffs in this case all served as Clinical Care Coordinators or Service Coordinators and joined MHT when the Bexar County service area opened, on or about 2007.  This particular CCC1 team was composed of 8 individuals. The duties of the CCC1 were described in the Molina Healthcare Position overview in this way:

15

"*(the CCC) Responsible for assessment, planning implementation, coordination, monitoring and evaluation of STAR+Plus membership. This position also assists management with training and department leadership*" *The daily functions of the Plaintiffs generally included, but were not limited to, performing in-home assessments (Forms 2060, Minimal Data Set (MDS), and Forms 2333), determining eligibility for Long Term Care benefits (provider services, adult daycare, home modifications, respite care, etc.) authorizing benefits and coordinating with providers to ensure services/benefits are started on a timely basis, submitting accurate documentation within identified timeframes, recording other healthcare needs that do not fall under MHT's approved benefits (i.e. a wheelchair for a member with Medicare benefits) and maintaining an electronic care plan for every member,( to include demographic information, diagnoses, all telephonic and in home communications, identified healthcare problems, goals, and outcomes).*

30.    The contract (Section 4.04.01- Uniform HMO Contract) was modified recently to require that the CCC1s/Service coordinators be college graduates, with a degree in social work or a similar field. Originally, when the Plaintiffs were first hired, the published qualifications asked for an MSW, as was set forth in MHT's contract with HHSC. Per, Molina -TX, this education requirement was later modified with HHSC approval because MHT said the company had no pool of MSWs applying for these positions.  This was MHT's position even though the company is located in a city with two local universities with MSW programs. In fact in 2008, Foerster came across an electronic file with 100's of resumes of local MSWs interested in the positions at MHT. It should be noted that at the time in 2007, MHT's operation in Harris County had only MSWs employed as CCC1s.

31.   Among the group of 8 CCC1s, 1 was an MSW, 2 were BSWs, 4 had college degrees, and 1 did not. This created personnel problems when it was inadvertently discovered by Reyna that the sole non-graduate was earning almost 20% more in salary than the others. More importantly, this individual was performing functions and coordination services that were beyond his level of education. After much grumbling from management, Gawlik and the others saw to it that the salaries of the other 7 CCC1s were raised, though they did not reach a level as that of the lone non-graduate. This particular individual escaped being laid-off, remained at his desk, and continued to work with Members.  MHT management indicated to staff that they had obtained a dispensation from HHHS permitting them to hire the non-college graduate as a CCC1. MHT refrained from addressing the CCC1s as "social workers" in their internal and external memos, since only 3 of the 8 CCC1s were social workers.

32.   In early 2008, the situation with understaffing became more critical.  The Houston office of MHT was so far behind on its annual re-assessments that the San Antonio Care Specialists (Clerical positions, non-degreed) were assisting them.  All contact by the Care Specialists with Houston Members was done by phone.  Form 2060 is the DADS Consumer Needs Assessment Questionnaire and Task/Hour Guide.  This assessment is required to be completed during a face-to-face visit with the Member. This is so that the CCC1 manager or nurse can observe and make a determination rather than rely solely on telephone answers by the Member.

17

33.    In summer of 2008, Reyna approached management, specifically Rebecca Garcia, Manager of Special Programs, and Chuck Carroll, President of MHT. She expressed her legal and ethical concerns with various practices, including the role of uncredentialed and untrained individuals performing skilled tasks. Reyna observed that MHT did not have adequate personnel to meet the huge demands to Members under the State contract, especially in its nascent stage.  As an example, one of the Plaintiffs observed five times or more that one of CCC2s, a Registered Nurse, enlisted a CCC1, a non-nurse, to make home visits on her behalf because the CCC2 was ill at home for some days, and did not have the time to personally see the homebound members. The CCC1 completed the patient evaluations which the CCC2 later submitted as her own. These assessments were instrumental in determining patient care, and they were not performed by a qualified professional, as required under the Contract. The Plaintiffs have it on good faith and belief, that these were not isolated events.

34.    As part of its Contract, MHT was responsible for seeing that an initial in-person assessment was made of each member by a CCC1, entered and downloaded to the State database.  At the end of 2007, it became clear to Foerster that MHT was not going to be able to meet that deadline and panic ensued because hundreds of members had not been properly assessed as required by the terms of the Contract.  Management hired 5-6 temporary employees, each a credentialed MSW to fill in the gap and work on the assessments.  There were no computers for the temporary MSW employees, so the work of preparing the assessment and downloading the data fell to the MHT

18

uncredentialed, data entry clerks who filled in the assessment forms and downloaded the assessments to the State.   The work was never timely submitted, and MHT was fined.

35.    Because of the nursing shortage, the CCC1s were given additional responsibilities to complete.  For example, SPW covers minor modifications to the home if they are medically necessary and recommended in the nurse's assessment, Form 3671. Rebecca Garcia, the Manager of Special Programs, instructed CCC1s to oversee the process where minor home modifications were required, even though they did not have the medical skills necessary to do that task.   The CCC1s were instructed to get three bids from a list of contractors provided and handle the modifications because the nurses were too busy.   Ramirez became concerned because these duties were clearly beyond the scope of the CCC1s job duties, and were a violation of terms of the Texas MCO Contract.    The 2010 STAR Plus Handbook states in part:

> **6420 Approval of Adaptive Aids and Medical Supplies**
>
> as a waiver service by the HMO only if the documentation supports the requested item(s) as being necessary and related to the member's disability or medical condition. The HMO determines if the documentation submitted is adequate, and makes the decision as to whether an adaptive aid or medical supply is needed and related to the member's condition. The HMO makes the final decision if the purchase is necessary and will be authorized on the individual service plan (ISP)

## II.

### Defendants Deny Members the Opportunity to Qualify
### for STAR+PLUS Waiver (SPW) Eligibility

36.    CCC1s, family or Members themselves can request that Members be preliminarily assessed for SPW.  This may happen when a CCC1 makes a routine visit to the home and might observe that the patient is in need of additional services.  Family or self-referrals for additional services are another way that a Member is referred for evaluation. A referral for SPW assessment is taken seriously because often the Member is in great distress. The preliminary assessment can be done by a CCC1 using the DADS Form 2333, titled Nursing Facility Risk Criteria Form. Form 2333 has a list of objective questions regarding risk factors, such as recent falls, incontinence, inability to perform simple personal hygiene.  If there are more than two risk factors are checked off on the Form 2333, the Member is then referred for a professional health assessment by a Registered Nurse requiring on-site observations of the Member. After this personal meeting, the Registered Nurse then recommends SPW services or issues a denial to the Member. The denial notice should be sent to the Member so that they have the option of exercising their Right to Appeal.  In many cases, because of the overwhelming numbers of Members and shortage of nurses at MHT, the determination of SPW disqualification was sometimes made by a non-clinical staff member or by phone. Plaintiffs will show in their Disclosure Statement examples of Form 2333, where a CCC1 checked off more than 2 risk factors, which would normally necessitate a further

20

assessment by a nurse. Even when the criteria were met, the CCC1 included comments that the Member did not need SPW, and the CCC2 rubber stamped the Form 2333, depriving a Member of assessment and possible SPW assistance.

37.  An example of just such a case involved a CCC1, not a college graduate and not a nurse, who did an intake on a Worker's Compensation case where the Member had been badly beaten. This was evidenced by the loss of the Member's eye, reliance on a wheelchair for mobility, and use of a neck brace. The Member requested to be evaluated for STAR Plus Waiver (SPW) because of the extent of his/her injuries and his/her inability to care for himself/herself. The uncredentialed CCC1 completed the Form 2333, and determined that this Member did not meet the criteria for SPW. Therefore, no nurse was sent out to do an onsite assessment of this Member. Three months later, Reyna took on the case and realized this Member still needed SPW, but had suffered for three months because a non-nurse made the decision to deny the injured Member the right services.

38.  This is clearly in violation of the MCO Contract with the State and serves to deprive the Member of services they are entitled to, that have been paid for by the Texas Medicaid Program, but that are being denied, in violation of MHT's contract with the State.

## III.

### Defendants Withhold Medicaid Services to Members and Provide Poor Quality of Care

39.    Molina TX's message to employees was to keep costs down and only recommend the most necessary of services for Members. Rebecca Garcia, the Manager of Special Programs, directed CCC1s that they could only recommend up to 20 hours of home health services a week for Level 2 Members. Over 20 hours had to be approved by Ms. Garcia. When requests were submitted to her with supporting documentation for the extra hours, Ms. Garcia would ignore the request for days and not timely respond.  Lower home health hours generally resulted in a lower medical loss ratio, and more profit. CCC1s are evaluated on the basis of their personal "Productivity Reports".  Ms. Garcia's delays negatively impacted the productivity of the requesting CCC1.  Many of the CCC1s became reluctant to recommend more than 20 hours of personal assistance for a Member because of the pressure from management.

### IV.

### Self-Referral Issues

40.    Three of the nurses who, in their capacities as CCC2s developed Individual Services Plan for Members, would authorize a certain number of hours per week of personal assistance and nursing care.  These nurses would direct and encourage the Members to choose to Girling Home Health, one of the approved providers. In time, Gawlik noticed that three of the MHT nurses were working second

jobs as Girling nurses on their off hours.  This created a conflict of interest and potential self-referral issues, especially when the nurses would refer the home health business to Girling, their second employer.

## V.

### Defendants Were Paid for Medicaid Services not Rendered

### Defendants Allow Provider Agencies to Re-Bill for Services Not Rendered

41.    Once a Member is approved for STAR PLUS Waiver (SPW) services, there is a two month lag in the MCO's receipt of from Medicaid.  During this period, of time, the MCO should be providing SPW services to the Member. Defendants were being paid for Level 3 services but only provided Level 2 care. Plaintiffs' Disclosure Statement has numerous examples of this practice.

The Member's name appears on the SPW list once it is entered by MHT staff. SPW reimbursement is typically enhanced for providers to SPW Members, and the frequency and intensity of services they provide may also be increased. Providers, such as physicians, therapists, home health agencies, etc, only know to provide a higher level of care (for which they can get a higher reimbursement) when they are notified by MHT that a Member has been upgraded to an SPW level of care.  Often, MHT does not notify providers of the Member's update until several months later.  Many providers, upon noticing that an upgrade was approved several months back, attempt to back bill for enhanced, higher-reimbursement services. One example shows that Member was

receiving regular STAR services 3 times a week, but under the new SPW plan, the Member was upgraded to daily visits for personal assistance because her condition grew worse, and there was no other caregiver.  Under these circumstances, the home health agency provider will often submit an amended invoice, re-billing using the new, higher enhanced rate.  It is submitted to MHT, where it is often paid, even though the home health services actually provided were not in conformity with SPW standards of care.  In this example, SPW pays an enhanced rate for home health service because the Member is alone and needs daily care.  The enhanced rate requires that the provider agency ensure someone will be there daily.  Often if a home health aide calls in sick, the agency will cancel service for a Star Plus Member on that day.  When you have an SPW Member, the agency must provide a home health aide every single day of authorized service.  This often entails having extra people on call at a greater cost to the agency.  The purpose of the enhanced rate is to cover that extra cost.  Providers who were unaware of a Member's changed status, though, submitted retroactive bills at the higher SPW rate when they did not provide the level of care required at the time.  This is unlawful because the providers with MHT's knowledge are submitting invoices for services not performed.   HHSC uses historical utilization data to calculate new capitation rates for the various STAR PLUS services.  Inflated invoices affect the future cost to the Medicaid program and impacts on MHT's reimbursements.

24

## VI.

### Defendants Market Business for its Strategic Partner at expense of Patient's Right to Choose

42.     A significant number of Level 2 and Level 3 Star Plus Members are prescribed an Emergency Response System (ERS).   It usually takes the form of a pendant or bracelet that can be worn and, in an emergency, can be activated to call for emergency assistance.   In an unusual move in 2007, Molina advertised in printed materials that Molina had a "strategic partnership" with Critical Signal Technologies ("CST") , a seller of ERS products and a company that was fairly unknown since it had only been formed in 2006.   CST offered a very competitive price to MHT and its subsidiaries, $11.  This is a very low price, about one-third the price when compared to other established providers.   CCC1s were instructed to attend a MHT meeting to familiarize themselves with the ERS product and to aggressively promote the CST model among STAR Plus Members.  CST was to be presented to Members as Molina's "Preferred Provider".  Printed material was handed out which showed the logos of both companies, touting them as "strategic partners." The CST product presented an excellent opportunity for MHT to decrease its cost of ERS systems, and therefore, increase profits. Members were to be told that the CST product was superior to what some of the products they were currently using, specifically the Dinsmore unit, a competitor. CST was presented as having more features and greater safety.   Members were called and told their current ERS service was being terminated. Many upset

Members phoned in because their old ERS systems were being picked up and a new company, CST, was dropping off a new product, unsolicited.   Many wanted to keep their old ERS system, but Molina instructed CCCs to strongly try to persuade the Member to take the new product.   Members were deprived of their right of choice, and MHT was unlawfully  promoting one network provider or product over another in violation of the Medicaid Managed Care Contract Terms and Conditions, Version 1.18, which in part states:

> **Section 4.10 HMO Agreements with Third Parties** *If the HMO is to report compensation paid to a third party (including without limitation an Affiliate) as an Allowable Expense under this Contract, and the compensation paid to the third party exceeds $100,000, or is reasonably anticipated to exceed $100,000, in a State Fiscal Year, then the HMO's agreement with the third party must be in writing. The agreement must provide HHSC the right to examine the agreement and all records relating to the agreement.*
> *(b)* ***All agreements whereby HMO receives*** *rebates, recoupments,* ***discounts***, *payments,* <u>or other consideration from a third party</u> *(including without limitation Affiliates) pursuant to or related to the execution of this Contract, must be in writing and must provide HHSC the right to examine the agreement and all records relating to such consideration. .*
> *(c) All agreements described in subsections (a) and (b) must show the dollar amount, the percentage of money, or the value of any consideration that HMO pays to or receives from the third party.*

**VII.**

Defendants Refuse to Provide Members with Required Accommodation for
Language and Interpretations Services

43.   Plaintiffs represent individuals who collectively have decades of experience with the Medicaid program in the State of Texas.   The issue of communicating with non-English speaking Members was a problem of paramount

concern. In 2007, MHT did not provide its service coordinators with any MHT Spanish Forms. There was a translation phone line that they were encouraged to use when communicating with non-English speaking Members.   Service coordinators and all others who had contact with these Members were encouraged to schedule home visits so that family members or neighbors could be there to translate phone calls and face-to-face meetings.

44.    The individuals in the CCC1 team were assigned a geographic service area of San Antonio by zip code. Census data was used to identify the percentages of the population in each zip code by primary language spoken.   The team of 8 CCC1s had at least 4 Spanish speakers. Counterintuitively, many CCC1s who spoke no Spanish were assigned to predominantly Spanish-speaking zip codes. Gawlik, an English-only speaker,  contacted Rebecca Garcia, Manager of Special Programs, Dr. David Vasquez, MHT Medical Director, and Margret Young, Director of Special Programs, and  Daisy Mitchell, Director of Human Resources, among others, regarding her concerns about her contacts with her Spanish-speaking Members and to request assistance in the form of translated documents , interpreters, or reassignment of CCC1s.

45.    Gawlik cited that many times she would be visiting and assessing a non-English speaking Member with no family or other interpreter present.  She called the interpreter line frequently, but most often could not get through, and when she did, there was a lag time in setting up the call with the Member and the interpreter.  The process

was not fluid, and took an inordinate amount of time.  This often presented a stressful situation for the Member being interviewed or assessed who was ill, confused, and not engaged.

46.    Gawlik was left to negotiate with other CCC1s who spoke Spanish to switch Members or zip codes with her.  Management did not step in to resolve these very important issues.  Not only was Molina's system of dealing with language barriers inefficient and discriminatory, but one that penalized and deprived Spanish-speaking Members of the information they needed to make personal choices on their healthcare.

47.    Service coordinators in San Antonio were not provided Molina-translated documents for their Spanish-speaking members.  The CCC1 group spoke up together and requested Spanish forms.  Local management responded that there were none available and Rebecca Garcia informed the CCC1s that "corporate approval" was needed for any translated documents.  The CCC1s were told that in Houston, there was a battery of Vietnamese language documents, but that none were in Spanish.

48.    Interestingly, San Antonio management prohibited employees from speaking Spanish in the office.   Derogatory rascist comments were allegedly made at a meeting by a staffer, and Reyna and others reported this to management.  It set off a firestorm. In the summer of 2008, present by phone, among others, was Joann Zarza-Garrido, Chief Executive Officer of California, from corporate headquarters.   When advised of San Antonio management's lack of Spanish forms because Molina Corporate had not approved them, Zarza-Garrido expressed puzzlement, and stated that "I don't

28

understand why they would say that." Molina management indicated that they had a department in California that translated documents into various languages, and that they provided a multi-lingual interpreter phone line. If these resources existed, the Members of MHT in Bexar County were not availed of those services in violation of various provisions in the MCO Contract.

49.     In August of 2008, six of the eight CCC1s were laid off. Molina cited that STAR Plus no longer required an assessment document, MDS-HC, and that their services were no longer needed.

50.     STAR Plus Members are entitled to language services that will allow them to understand their benefits and relevant information, so that they can make their own healthcare decisions. For example,

Section 7.05(b) of the Uniform Managed Care Contract says in part:

> Section 7.05(b) HMO agrees to comply with Title VI of the Civil Rights Act of 1964, and its implementing regulations at 45 C.F.R. Part 80 or 7 C.F.R. Part 15, prohibiting a contractor from adopting and implementing policies and procedures that exclude or have the effect of excluding or limiting the participation of clients in its programs, benefits, or activities on the basis of national origin. Applicable state and federal civil rights laws require contractors to provide alternative methods for ensuring access to services for applicants and recipients who cannot express themselves fluently in English. HMO agrees to ensure that its policies do not have the effect of excluding or limiting the participation of persons in its programs, benefits, and activities on the basis of national origin. HMO also agrees to take reasonable steps to provide services and information, both orally and in writing, in appropriate languages other than English, in order to ensure that persons with limited English proficiency are effectively informed and can have meaningful access to programs, benefits, and activities.

51.     Molina Healthcare, Inc.'s 10-K (3/16/2010) filed with the Securities and

Exchange Commission on page 4, says in part:

> *Cultural and Linguistic Expertise. We have 30 years of experience developing*
> *targeted health care programs for culturally diverse Medicaid members, and*
> *believe we are well-qualified to successfully serve these populations. We*
> *contract with a diverse network of community-oriented providers who have the*
> *capabilities to address the linguistic and cultural needs of our members. We*
> *educate employees and providers about the differing needs among our*
> *members. We develop member education materials in a variety of media and*
> *languages and ensure that the literacy level is appropriate for our target*
> *audience.*

52.     Plaintiffs allege that Molina and MHT did not comply with the terms of their

MCO contract in Texas by not allowing Spanish-speaking Members to have the

information they needed to make informed decisions.

### VIII.

### Defendants are Depriving Members of the Right to Appeal Adverse Actions and Delaying the SPW Approval Process

53.     Plaintiffs believe that because of large workloads, understaffing, and poor

management oversight, MHT did not ensure that the appeal rights of each Member

were honored.  Frequently, a Member would apply for a STAR Plus Waiver upgrade.

Every application requires a physician signature before it can be finally approved.  In the

process, case files would be left on hold awaiting a physician signature but without any

action for over 90 days. The Member's case for SPW application would be closed by

MHT, basically denying the case because of inaction  Plaintiffs have included examples

of these violations in their Disclosure Statement, one of which involved a frail, elderly

woman who remained bedridden for months, because her SPW application was not attended to and had to be re-submitted.  Another case observed by Munoz, involved a Member who needed oxygen and services immediately, but was forced to suffer through a second application process because of MHT's delay.  For others, like her, there was no Adverse Action Notice sent to the Member so the Member had no option to appeal the decision.

54.    Oftentimes, these individuals being serviced were mentally or physically fragile and were in immediate need of the extra services.  It was not until the Members called MHT to check on the status of their case, did they find out it was closed out for lack of action, usually a missing M.D. signature.  Staff was advised to encourage the Member to re-apply and go through the process again, since there was no basis for Appeal.

55.    The Right to Appeal Adverse Actions is an important right of every MCO member in Texas and expressly provided for by Medicaid in the MCO Contract.

**The United States and the State of Texas have been damaged**

56.    The Defendants have profited and the United States and State of Texas have been damaged substantially monetarily by the practices used by the Defendants to make claims for payment and reimbursement from the federal and state health programs, namely Medicaid. Through their fraudulent practices, it is alleged that defendants unlawfully and knowingly presented or caused to be presented, a false or fraudulent claim for payment or approval and knowingly made, used, or caused to be

made or used a false record or statement material to a false or fraudulent claim to the United States of America and the State of Texas under the laws pertaining to the Medicaid program.

## COUNT ONE

### Federal False Claims Act 31 U.S.C. §3729, *et. seq.*

57.    Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 56 of this Complaint as if they were incorporated herein verbatim.  From 2007 to the present, Defendants received all or part of their revenues from the United States under the Medicaid MCO contract with the state of Texas.  An estimated 60+% of the revenues paid to Defendants, which was the FFP, represented federal monies.

58.    By means of the acts above, Plaintiffs would show that Defendants Molina Healthcare, Inc. and Molina Healthcare of Texas, Inc.,  through the acts of their officers, agents, and/or employees knowingly or in deliberate ignorance of the truth or the falsity of the information made, used or caused to be made or used, a false and fraudulent record or statement to get a false or fraudulent claim paid or approved the by the government health programs to  the damage of the Treasury of the United States for services to Medicaid beneficiaries  that were not performed or  improperly performed.

59.    Plaintiffs would show that in performing the acts set out in this Complaint, the Defendants through the acts of their officers, agents, and/or employees knowingly or in deliberate ignorance of the truth or the falsity of the information, conspired to defraud

32

the government health programs by getting a false and fraudulent claim allowed or paid to the damage of the Treasury of the United States.

60.    Plaintiffs would further show that in performing the acts set out in this Complaint, the Defendants through the acts of their officers, agents, and/or employees knowingly or in deliberate ignorance of the truth or the falsity of the information, violated the documentary and procedural requirements for the submission of claims and for the reimbursement of monies as set forth in Defendants' contracts and as such constitute false and fraudulent claims under the ACT.

61.    By reason of the Defendants' actions, the United States has been damaged, and continues to be damaged, in a substantial amount.

62.    This is a claim for treble damages, civil penalties and attorney's fees, under the Federal False Claims Act, 31 U.S.C. §3729, *as* amended.

## COUNT TWO

## TEX. HUM. RES. CODE ANN. §36.002

63.    Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 56 of this Complaint as if they were incorporated herein verbatim.  From 2007 to the present, Defendants received all or part of their revenues from the State of Texas under their Medicaid MCO contract with the State. An estimated 39+% of these revenues, which was the state match,  represented State of Texas monies.

64.    By means of the acts described in paragraphs 1 through 56 above,

Defendants intentionally made or caused to be made false statements or misrepresentations of material facts on applications for payment under the government health programs, specifically, the Medicaid program of the State of Texas.

65.     Defendants furthermore knowingly and intentionally concealed or failed to disclose information about services that were not performed, improperly performed, or performed outside the terms and conditions of their Medicaid contract with the State of Texas which resulted in payment and reimbursement that unjustly enriched Defendants and to which they were not entitled.

66.     By reason of the Defendants' actions, the State of Texas has been damaged, and continues to be damaged, in a substantial amount.

67.     This is a claim for restitution, prejudgment interest, civil penalties, double damages, attorneys' fees, expenses and costs, pursuant to TEX. HUM. RES. CODE ANN. §36.101, *et. seq.* and, for violations of TEX. HUM. RES. CODE ANN. §36.002.

### Count III

### Retaliatory Actions by Defendants Against Plaintiffs

### False Claims Act, 31 U,S,C, § 3730(h)

### Tex. Hum. Res. Code. Ann. Section 36.115, *et. seq.*

68.     Plaintiffs acting on behalf of themselves against Defendants under the "Whistleblower protection" provision of the False Claims Act, 31 U.S.C. §3730(h), adopt and reiterate all of the foregoing facts alleged in paragraphs 1 through 56 as fully and completely as if they were incorporated herein verbatim, This Court has jurisdiction over

this claim pursuant to 31 U.S.C. §3730(h) and 3732(a), as well as through pendent claim jurisdiction.

69.    Plaintiffs acting on behalf of themselves against Defendants under the retaliation provisions of the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code. Ann. Section 36.115, *et. seq.* adopt and reiterate all of the foregoing facts alleged in paragraphs 1 through 56 as fully and completely as if they were incorporated herein verbatim.

70.    Plaintiffs would show that Defendants in their acts and/or practices, subjected Plaintiffs to harassment, retaliation, discrimination and public humiliation resulting in loss of their employment, promotions and wages.

71.    Plaintiffs learned of the fraudulent acts being perpetrated upon the United States and the State of Texas by Defendants. On several occasions, variously as a group and individually, Plaintiffs requested officers and agents for Defendants to investigate, stop and report the fraud to the United States and to the State of Texas. Defendants not only failed to do so and refused, but also set about to obstruct Plaintiffs' further efforts to gather information regarding all fraudulent activities. Defendants harassed and discriminated against Plaintiffs, and undermined their credibility and personal and professional integrity and competence.  Ultimately, all five Plaintiffs were laid off on what Plaintiffs allege was retaliation.

72.    Plaintiffs request this Court to grant to Plaintiffs  such relief as they may be entitled to under the provisions of the False Claims Act, 31 U,S,C, §3730(h) and Texas

Medicaid Fraud Preventions Act, Tex. Hum. Res. Code. Ann. Section 36.115.

## JURY DEMAND

73.     Plaintiffs demand a trial by jury.

## PRAYER

74.     The Defendants are liable to the United States for civil penalties and treble damages, pursuant to 31 U.S.C. §3729(a), and to the State of Texas for treble damages, prejudgment interest on single damages amount sustained, and civil penalties pursuant to TEX. HUM. RES. CODE ANN. §36.052. In addition, the Plaintiffs are entitled to recover their reasonable expenses, attorney's fees, and costs incurred in prosecuting this action, pursuant to 31 U.S.C. §3730(d) and TEX. HUM. RES. CODE ANN. 36:110(d). Further, the Plaintiffs are entitled to a share of the proceeds of this action, pursuant to 31 U.S.C. §3730 (d) and TEX. HUM. RES. CODE ANN. §36.110.

WHEREFORE, Plaintiffs pray that upon trial or final hearing the Court grant judgment for Plaintiffs and the United States against the Defendants, as follows:

a.     for civil penalties for each false claim pursuant to 31 U.S.C. §3729(a);

b.     for three times the amount of damages sustained by the United States, pursuant to 31 U.S.C.§3729(a);

c.     for the Plaintiffs' reasonable attorneys' fees and expenses, pursuant to 31 U.S.C. §3730(d);

d.     for costs of court;

e.     for pre-judgment and post-judgment interest at the rates permitted by law; and,

f.    for such other and further relief as may be appropriate and authorized by law.

Plaintiffs further pray that they be awarded an appropriate percentage of the proceeds of this action, in accordance with 31 U.S.C. §3730(d).

Plaintiffs further pray that judgment be granted for Plaintiffs and the State of Texas against the Defendants for all damages and multiples of damages, civil penalties, attorneys' fees, costs and expenses, and interest recoverable under TEX. HUM. RES. CODE ANN. §§36~007 and 36.052; and,

Plaintiffs pray also that they be awarded an appropriate percentage of the proceeds of this action, in accordance with TEX. HUM. RES. CODE ANN. §36.110.

Plaintiffs pray that upon a finding of liability under TEX. HUM. RES. CODE ANN. §36.052, that the Defendants be prevented from providing or arranging to provide health care services under the Texas Medicaid program for a period of 10 years in accordance with TEX. HUM. RES. CODE ANN. §36.005(b).

Plaintiffs further pray that this Court grant to Plaintiffs such relief as they may be entitled to under the provisions of the False Claims Act, 31 U.S.C. §3730(h) and Texas Medicaid Fraud Preventions Act, Tex. Hum. Res. Code. Ann. Section 36.115, .

Respectfully Submitted,

By:   _Marlene M. Martin_

MARLENE M. MARTIN
State Bar No. 01393770

37

## CERTIFICATE OF SERVICE

The undersigned certifies that on this __13__ day of April, 2011, a copy of the foregoing original Complaint was placed in the United States Mail, first class mail, postage prepaid, and addressed to:

Honorable Eric Holder
Attorney General of the United States
555 Fourth Street Northwest
Washington, D.C. 20001

John Murphy
U.S. Attorney for the Western District
61 N.W. Loop 410, No. 600
San Antonio, Texas 78216

Greg Abbott
Attorney General of Texas
Civil Medicaid Fraud Division
ATTN: Susan Miller
P.O. Box 12307
Austin, Texas 78711-2307

MARLENE M. MARTIN